WHITE *v.* LAKE SHORE & MICHIGAN SOUTHERN RAIL-WAY CO.

RAILROADS—PERSONAL INJURIES—NEGLIGENCE — EVIDENCE — SUF-FICIENCY.

In an action against a railroad company for injuries to a brakeman by reason of a collision of two trains, evidence examined in the light most favorable to plaintiff, and *held*, insufficient to establish negligence on the part of defendant, and a verdict was properly directed in its favor.

Error to St. Joseph; Yaple, J. Submitted February 18, 1909. (Docket No. 93.) Decided April 30, 1909.

Case by William White against the Lake Shore & Michigan Southern Railway Company for personal injuries. There was judgment for defendant on a verdict directed by the court, and plaintiff brings error. Affirmed.

*Richard Price,* for appellant.

*Dallas Boudeman,* for appellee.

OSTRANDER, J. Plaintiff, employed as a brakeman by the defendant, was injured on the morning of Febru-

ary 23, 1901, in a collision of freight trains at White
Pigeon.   The collision occurred within the yard limits as
fixed by the rule of defendant company.   It is the claim
of defendant that the crews of both trains were at the
moment violating rules of the company and rules of ordi-
nary prudence, the west-bound train in going upon the
main line track without protection from trains lawfully
using the track, the east-bound train in approaching the
yard at an improper speed and, as no switch lights were
seen in the yard, without stopping to ascertain if the road
was clear.   The court below was of opinion that there
was no evidence to support a finding that the injury to
plaintiff was the result of negligence of defendant.   It is
the contention of plaintiff that the testimony tends to
prove that the brakeman whose duty was, it is said, to
protect the west-bound freight against incoming east-
bound trains, did not understand his duty, had not been
instructed in the manner of its proper performance, and
was therefore an incompetent and improper person, at
the time, to be employed in that service, and that it also
tends to prove that the trainmen in charge of the west-
bound freight had been notified that the east-bound train
in question had been annulled.   Both of these facts being
established, or either of them, it is claimed that negligence
of the master which contributed with negligence of fel-
low-servants of plaintiff to the injury and the consequent
liability of defendant is also established.

As often occurs, the attempt to fix responsibility for the
catastrophe is one of some difficulty.   We are, however,
called upon to decide whether, viewing the testimony
which was produced in a light most favorable to plaintiff,
questions of fact determinative of the legal liability of de-
fendant to plaintiff in this action ought to have been sub-
mitted to the jury.   It is convenient to consider events in
the order of their occurrence.   Freight train 551 is a reg-
ular scheduled train running from Grand Rapids to
White Pigeon; thence to Elkhart.   It bears the same

number whether on the Grand Rapids branch or on the main line. On February 22d, in its trip from Grand Rapids to White Pigeon, and because of an excessive fall of snow, a portion of the train was left on the road and the remainder was moved to White Pigeon. There, at 1:45 a. m., February 23d, the conductor and engineman of this train received the following order:

"THE LAKE SHORE & MICHIGAN SOUTHERN RY. CO.
        "Telegraph Train Order No. One (1).
                "Superintendent's Office, White Pigeon,
                                    2\23, 1901.
"For White Pigeon, to C. and E. of No. 551.
    "No. five fifty No. 550 of February Twenty Third 23rd is annulled.
                                    "A. H. S.
    "Conductor and Engineer must each have a copy of this order.
    "Time received, 1:45 A. M.—O. K.
                "Given at 1:46 A. M.

| Conductor | Train | Made | At | Received by |
|-----------|-------|------|-----|-------------|
| O'Doud | No. 551 | Complete A. H. S. | 1:47 A. M. | Davenport." |

The reason for this order may be stated here. Train No. 550, on which plaintiff was riding, is a regular freight train running from Elkhart to White Pigeon; thence to Grand Rapids. It has the same number on the main line and on the Grand Rapids branch. Compared with No. 551, it is the superior train. It is scheduled to leave Elkhart at 1:40 a. m., reaching White Pigeon at 2:50 a. m., and Grand Rapids at 10:10 a. m. If, therefore, the locomotive and crew of train No. 551 returned over the Grand Rapids branch to move the abandoned cars, they would be using the track of the division upon the time of train No. 550, since they did not expect to arrive with them at White Pigeon before 2:50 a. m. After receiving this order, train No. 551 did move the abandoned cars, arriving at White Pigeon at some time later than 4 a. m. It was there, and for the purpose of proceeding to Elkhart, made train No. 553, by the following order:

"THE LAKE SHORE & MICHIGAN SOUTHERN RAILWAY
COMPANY.
"Telegraphic Train Order No. 11.
"Superintendent's Office, Toledo, Ohio.
2 / 23, 1901.
"For White Pigeon to Conductor and Engineer of En-
gine No. 362.
"Engine No. 362 three sixty two will run as number
five fifty three, 553, White Pigeon to Elkhart.
"A. H. S.
"Conductor and Engineer must each have a copy of
this order.
"Time received, 4:34 A. M.   Given at . . . . . . M.

| Conductor | Train | Made | At | Received by |
|-----------|-------|------|-----|-------------|
| O'Doud | Engine No. 362 | Complete A. H. S. | 4:35 A. M. | Davenport." |

Train No. 553, on the time card, is a regular train on the
main line, leaving White Pigeon at 1:40 a. m., arriving
at Elkhart at 2:40 a. m.   The train crew was not changed.
Nevertheless, train No. 551, then nearly 12 hours over-
due, was, by force of this order, and so far as the main
line was concerned, canceled.   It was train No. 550 and
train No. 553 which were in collision.   The conductor of
No. 553 was Michael O'Doud, the engineman was Frank
J. Bock, and the head brakeman was Earl Allison.   W.
H. Davenport was night train dispatcher of the Grand
Rapids branch and was also telegraph operator for the
main line.   He in no manner controlled the movement of
trains on the main line.   That control was exercised from
Toledo, Ohio.   But all orders were signed with the ini-
tials of the superintendent, Smith—A. H. S.—by the re-
spective train dispatchers, and the various orders indi-
cated from which office they emanated by being dated at
Toledo and White Pigeon, respectively.   Before the train
left the Grand Rapids branch and proceeded by the left
leg of the Y to the main line, Conductor O'Doud asked
Davenport where No. 550 was.   Davenport inquired and
told him it was about leaving Elkhart.   This was not an

order. The information was not given in writing. O'Doud thereupon told his engineman, Bock, to take the train out and to back in on a main line siding ready to proceed to Elkhart at the proper time. He also told Allison, the head brakeman, to get on the engine, ride around the Y, and go out with a flag. He himself undertook to protect the train from the east. Allison rode to the main line switch, opened it, and, according to his testimony, rode out on the main line upon the engine, intending when the train was clear of the Y to drop off with his lantern and protect the train from anything approaching from the west. To this point there is little material disagreement concerning the facts. The engineer testified that he did not know that Allison rode out on the main line in the engine cab, and that the last he saw of him he had gone ahead of the engine to, and had thrown, the main line switch. He admits that he at once pulled his train out upon the main line. Bock's excuse for his own actions is that he understood that train No. 550 had been annulled, not on the division only, but also on the main line. He testified:

" I would not have gone out on the main track at that time in that manner were it not for that order which I received annulling 550."

Allison's excuse is: *First*, that in throwing the switch and in riding out as he says he did he supposed he was obeying the orders of the conductor; *second*, that after throwing the switch the train came on so fast that he could in no event have preceded it. There is testimony to the effect that, if 550 had been annulled on the main line, then 553 would have had no occasion to send out protection because, at the time, it was using the track, within yard limits, on the time of no train except 550. There is testimony tending to support a finding that Allison, who had no experience as brakeman prior to February 16, 1901, had not received the instruction necessary to a proper performance of all of the duties of a flagman.

His own testimony, while not entirely in harmony with that given by him at the coroner's inquest, indicates pretty clearly that he understood that he was obeying the orders of the conductor, and that he was confirmed in his understanding by the fact that the engineer, who had the right to direct his movements, proceeded upon the main line track.   It is unquestioned that the engineer knew he had gone ahead to throw the main line switch, knew he had thrown it, and obeyed his signal to go ahead.   It is unquestioned that as the train was moved the brakeman could not have preceded it out upon the main line.   There is no testimony tending to prove that the brakeman did not possess intelligence.   He knew the necessity for, and had prepared to take with him, a red lantern.   There is every reason to believe that he would have left the engine on the main line and remained there until recalled.   It does not appear from his testimony that he knew anything about the position of train 550 or about the order annulling it.   He did not control or direct the movements of the train, but acted under the orders of the conductor and engineer.   The situation, as developed from the testimony of these three men, was as follows:   Each was bound to know the right of all trains on the time card.   Each was bound to know that in going out upon the main line track with No. 553 the superior right of No. 550, if that train was not annulled, was invaded.   O'Doud understood that No. 550 had not been annulled, so far as the main line was concerned, but supposed there was time to make the siding before it could run from Elkhart.   He, however, ordered protection for his own train.   Bock supposed No. 550 had been annulled upon the main line.   Allison did not know it had been annulled, and did not know where it was, but undertook to protect the train in obedience to the order of the conductor, as he understood the order, and as the conduct of the engineman, Bock, indicated that he was expected to do.

It is clear that the fault, so far as the operations of train No. 553 are involved, consisted in leaving the Y

without sending out a flag to the west. For this, responsibility rests either upon Bock alone or upon Bock and O'Doud. Allison's competency or want of competency had nothing to do with it. It is not alleged that Bock was incompetent. It is established by the testimony, so conclusively that an opposed finding would be set aside by the court, that Bock should have known that No. 550 from Elkhart to White Pigeon was not annulled by the order first above set out. We therefore reach the conclusion that there is no testimony tending to establish the alleged negligence of the defendant. It is not necessary to examine the testimony showing the manner in which train No. 550 was operated. It is sufficient to say that it tends strongly to prove that when it entered the yard limits it was running at an excessive speed, that the conductor, who was riding in the snow plow, and who from there controlled the movements of the train, discovered that for some reason none of the switch lights in the yard were visible, and that it was practically in collision with No. 553 when the headlight of that train was first noticed.

The judgment is affirmed.

HOOKER, MOORE, McALVAY, and BROOKE, JJ., concurred.